IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JAEDON KOEHLER, a minor**　　　　:　　**No. 1:07-CV-0117**
**by and through his parent and**　　:
**legal guardian, Scott C.**　　　　　:　　**JUDGE SYLVIA H. RAMBO**
**Koehler,**　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　　　　**Plaintiff**　　　　　:
　　　　　　　　　　　　　　　　　:
　　　　**v.**　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　:
**JUNIATA COUNTY SCHOOL**　　　　:
**DISTRICT, et al.,**　　　　　　　　 :
　　　　　　　　　　　　　　　　　:
　　　　　　　**Defendants**　　　　 :

**M E M O R A N D U M**

　　　　Plaintiff Jaedon Koehler is a fifteen-year old non-verbal autistic student who is a qualified child with a disability under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. To provide him with a free appropriate education, he was instructed at a private school at the direction of and with close involvement by employees of his public school district. Plaintiff, by his father Scott Koehler, alleges that certain defendants violated the IDEA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, because they failed to provide him with an education appropriate to his abilities and disabilities. He alleges that certain defendants subjected him to physical punishment that violated his right to substantive due process under the Fourteenth Amendment to the United States Constitution and state tort law.

　　　　The school district and its employees have answered Plaintiff's amended complaint and brought cross-claims against the private entities and employees. The private entities and employees have moved to dismiss Plaintiff's amended complaint and the cross-claims. The disposition of these motions follows.

**I.**         <u>Background</u>

   **A.**   <u>Facts</u>

   For purposes of this motion to dismiss, all facts stated in the amended complaint are accepted as true.  The court will begin with a description of the parties, then recount the chronology of events leading to this litigation.

   **1.**   <u>The Parties</u>

   Plaintiff Jaedon Koehler lives within the Juniata County School District.  In addition to autism, he suffers from severe mental retardation, significant language delay, hearing loss, aggressive behavior, and seizure disorder, among other mental and physical challenges.  Thus, he needs a great deal of assistance with daily living skills, behavior, gross and fine motor skills, speech and language, and all academic areas.

   It is helpful to group the Defendants in this case by affiliation and describe their relationships.  The court will refer to the "School District Defendants," which group includes the Juniata County School District ("School District"), Thomas Muir, Superintendent of the School District, and Dr. Elise Hazel, Director of Support Services for the School District.

   Northwestern Human Services of Pennsylvania ("Northwestern"), is a non-profit health and human services corporation.  Northwestern contracted with the School District to provide special education services for School District students with mental health challenges, physical disabilities, and mental retardation.  The Juniata River Center for Human Services ("River Center") is "a program and/or subsidiary created by Defendant Northwestern . . . to provide mental health, mental retardation and educational support services in Hunting[d]on, Mifflin and Juniata

Counties." (Am. Compl. ¶ 8.) The Derry Center Alternative Education School ("Derry Center") is "a facility owned and operated by Defendant Northwestern and/or Defendant River Center." (*Id.* ¶ 7.) The School District Defendants allege that the School District, Northwestern, and the River Center were subject to a Purchase of Service Agreement ("Agreement"). The Agreement governs the financial and legal relationship among those entities for the purpose of educating children at the Derry Center.

Lorna Hogeland served as the Director of the Derry Center and was the "Supervisor and/or 'Behavior Specialist' in charge of the educational services" rendered to Plaintiff. (Am. Compl. ¶ 9.) In this capacity, she was an "employee and/or agent" of Defendants Northwestern and the School District. (*Id.*) Karen Wert was also an employee or agent of "Northwestern and/or the School District" by serving in the role of "Autism Specialist." (*Id.* ¶ 10.) She "supervis[ed] and/or implement[ed] the educational services . . . rendered" to Plaintiff at the Derry Center. (*Id.*) John Calhoun was an Agency Director for the Derry Center. He "personally participated in, knew of and/or acquiesced" in the events giving rise to the amended complaint. (*Id.* ¶ 11.) Plaintiff avers that Hogeland, Wert, and Calhoun were "policymakers" for and agents of Northwestern, River Center, "and/or" the School District. Northwestern, the River Center, Hogeland, Wert, and Calhoun are, collectively, the "Northwestern Defendants." Hogeland, Wert, and Calhoun are referred to occasionally as the "Individual Northwestern Defendants." Muir, Hazel, Hogeland, Wert, and Calhoun are the "Individual Defendants."

3

Plaintiff avers that all of the individuals named, except Muir, "personally participated in, directed, knew of and/or acquiesced in" the activities that give rise to Plaintiff's cause of action.  (Am. Compl. ¶¶ 5-6, 9-11.)

## 2.   The Sequence of Events

In 2005, Plaintiff's family relocated to the School District.  His father, Scott Koehler, provided the School District with information about Plaintiff, including his pertinent medical and psychological records and the Individualized Education Programs ("IEP") under which his education had progressed in previous school systems.  Hazel, Hogeland, Wert, and Calhoun prepared an IEP for Plaintiff to be effective during the regular school year lasting from Fall 2005 to Summer 2006.  They decided to place Plaintiff at the Derry Center for his education.  Before Mr. Koehler agreed to the Derry Center placement, he toured the facility with representatives from the School District, Northwestern, and the River Center.

Mr. Koehler was satisfied that the Derry Center was appropriately equipped to address Plaintiff's educational and emotional needs.  The IEP included arrangements for Plaintiff to receive instruction in a traditional classroom setting adjacent to a common area.  The room, during Mr. Koehler's tour, was constructed of dry wall, had carpeting, was well-lit, colorful and appropriately equipped for an educational setting with a desk, toys, and other instructional aids.  The majority of Plaintiff's instruction would occur in the room, but Mr. Koehler was assured that Plaintiff would also interact with other students during activities like lunch, arts and crafts, and recess.

Plaintiff began the 2005-2006 school year at the Derry Center.  Soon after he began, however, Defendants[1] informed Mr. Koehler that Plaintiff appeared to be regressing cognitively, emotionally, and socially.  He was acting out aggressively and urinating and defecating in his clothes.  Mr. Koehler did not see these behaviors in Plaintiff at home.

On or about October 18, 2005, Dr. Beverly A. Hmel, a child psychologist, evaluated Plaintiff upon referral by the River Center.  She reported that since Plaintiff began attending the Derry Center, his academic progress had deteriorated while his aggressive and self-abusive behavior escalated.  She noted a concern for the safety of both Plaintiff and his fellow students and service providers.  Dr. Hmel reported that the Derry Center was unable to provide the level of care that ensured his safety, mental health, and continued educational progress.  She recommended that Plaintiff be placed in a residential facility where he could regain control of his destructive behavior and physical aggression toward others in a safe environment.  Defendants, aware of Dr. Hmel's recommendations, continued Plaintiff's instruction at the Derry Center.

Mr. Koehler did not see a need for a residential facility because Plaintiff's behavior at home was not problematic.  In November 2005, he invited Wert into his home so that she could observe Plaintiff's home behavior.  While there, Wert "made a passing reference to Mr. Koehler that Defendants had been placing [Plaintiff] in a type of restrictive 'coverall,' which she purposefully did not

---

[1]  Plaintiff does not specify which Defendants took particular actions in his amended complaint.  Where Plaintiff uses the generic term, the court will follow suit.  Recent Third Circuit precedent indicates that using the general "defendants" in a complaint suffices to put all defendants on notice of their obligation to defend that allegation.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 238 n.5 (3d Cir. 2008).

fully or adequately describe, to prevent him from taking his clothes off." (*Id.* ¶ 41.) Mr. Koehler was shocked that any restraints had been used upon Plaintiff without his consent.  Wert "proclaimed, in words or substance, that Defendants felt that in this case it would be 'far better to beg for forgiveness than to ask for [Mr. Koehler's] permission.'" (*Id.*)  Mr. Koehler did nothing to investigate immediately after Wert's admission.

On or around December 1, 2005, Hogeland contacted Mr. Koehler to inform him that a teacher or aide at the Derry Center was injured while trying to restrain Plaintiff during an emotional outburst.  She continued that she had already begun the process to have Plaintiff involuntarily committed to a psychiatric institution.  Mr. Koehler informed Hogeland that he would be at the Derry Center in minutes to remove his son.

When he arrived, ten to fifteen minutes later, Mr. Koehler was outraged by what he found.  "Defendants, without Mr. Koehler's knowledge or consent, unilaterally transformed [Plaintiff's] once carpeted, colorful, decorated, well-lit and furnished classroom" by "removing the carpeting, replacing and/or covering the walls with sheets of plywood, covering up the only window in that room and removing the desk and all other furnishing and instructional aids that were in that classroom when it was inspected and approved by Mr. Koehler." (*Id.* ¶ 45.) Plaintiff was locked in this room, after Defendants had raised the temperature therein.  Plaintiff was not free to move about.  He was restrained in a "thermally-insulated camouflage jumpsuit with the zipper pinned and duct taped shut to prevent him from escaping." (*Id.* ¶ 46.)  Plaintiff was drenched in sweat and reeking of feces and urine.  It took Mr. Koehler several minutes to free Plaintiff from the jumpsuit.

Even after he was released, Plaintiff remained withdrawn into himself.  After "prolonged reassurances and prompting on Mr. Koehler's part" Plaintiff began to recover and make eye contact.  Mr. Koehler removed Plaintiff from the Derry Center that day and did not return.

Mr. Koehler filed a due process complaint about the incident with the School District.  During the subsequent investigation, Hogeland "admitted that Defendants Hazel and Wert had instructed her and other Derry Center staff members to restrain, isolate and lock [Plaintiff] in the plywood room in the insulated camouflage jumpsuit whenever he became aggressive."  (*Id.* ¶ 49.)  Wert, however, was rarely at the Derry Center to provide autism support for Plaintiff.  The staff members in charge of Plaintiff's direct care were not "properly trained to provide educational instruction to autistic students."  (*Id.* ¶ 50.)

Plaintiff avers that in light of the foregoing facts, he has suffered "a deprivation of his protected educational rights under the IDEA, Section 504 [of the Rehabilitation Act] and applicable governing regulations; a deprivation of his guaranteed substantive due process rights to be free from wrongful confinement, physical abuse/restraint, unjustified intrusions on personal liberty/security and arbitrary government action; severe emotional distress and trauma; educational and emotional set-backs and other injuries and damages."  (*Id.* ¶ 53.)

## B.    **Procedural History**

Plaintiff filed his initial complaint on January 23, 2007, using 42 U.S.C. § 1983 as a vehicle for his IDEA and due process claims.  (Doc. 1.)  The Northwestern Defendants filed a motion to dismiss on April 19, 2007.  (Doc. 13.) The School District Defendants answered the complaint and cross-claimed against

the Northwestern Defendants on May 3, 2007.  (Doc. 21.)  Northwestern and the

River Center moved to dismiss the cross-claim on June 6, 2007 (Doc. 31), as did

Wert, Calhoun, and Hogeland (Doc. 33).  On June 22, 2007, Plaintiff notified the

court that *A.W. v. Jersey City Public Schools*, 486 F.3d 791 (3d Cir. 2007),

foreclosed his ability to maintain his IDEA claims via § 1983.  The court thus

granted Plaintiff leave to file an amended complaint.  All previous motions were

deemed moot.

On July 19, 2007, Plaintiff filed an amended complaint with numerous

causes of action.[2]  (Doc. 48.)  The School District Defendants answered the

complaint and cross-claimed against the Northwestern Defendants on August 17,

2007.  (Doc. 55.)  Also on August 17, Northwestern and the River Center moved to

dismiss the amended complaint (Doc. 56), as did Wert, Calhoun, and Hogeland

(Doc. 57).  On September 6, 2007, Wert, Calhoun, and Hogeland moved to dismiss

the School District Defendants' cross-claim.  (Doc. 72.)  On September 13, 2007,

---

[2]  Grouped by Defendant or Defendants charged, Plaintiff alleges that:
- The School District violated the IDEA and Section 504 of the Rehabilitation Act (Count I), violated Plaintiff's substantive due process rights under the Fourteenth Amendment (Count IV), was deliberately indifferent to the risk of injury to Plaintiff (Count VI), failed to train and/or supervise Plaintiff's special education program such that he sustained constitutional injury (Count VIII), and breached its special custodial relationship with Plaintiff (Count IX).
- Muir and Hazel violated Plaintiff's substantive due process rights under the Fourteenth Amendment (Count III) and conspired to violate Plaintiff's civil rights (Count V).
- Northwestern and the River Center violated the IDEA (Count II), violated Plaintiff's substantive due process rights under the Fourteenth Amendment (Count IV), were deliberately indifferent to the risk of injury to Plaintiff (Count VII), failed to train and/or supervise Plaintiff's education such that he sustained constitutional injury (Count VIII), were negligent (Count X), and intentionally inflicted emotional distress upon him (Count XI).
- Hogeland, Wert, and Calhoun violated Plaintiff's substantive due process rights under the Fourteenth Amendment (Count III), conspired to violate Plaintiff's civil rights (Count V), were negligent (Count X), and intentionally inflicted emotional distress upon him (Count XI).

Northwestern and the River Center did the same.  (Doc. 77.)  All motions are ripe and ready for disposition.

## II.        <u>Legal Standard – Motion to Dismiss</u>

Among other requirements, a sound complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "Fair notice" in Rule 8(a)(2) "depends on the type of case — some complaints will require at least some factual allegations to make out a showing that the pleader is entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (quotation omitted).  "A situation may arise where, at some point, the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8." *Id.*  A plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief. *Twombly*, 127 S. Ct. at 1965; *accord, e.g., Phillips*, 515 F.3d at 231; *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (The court is not "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation." (quotations and citations omitted)); *Evancho v. Fisher*, 423 F.3d 347, 350 (3d Cir. 2005).

A defendant may attack a complaint by a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  In deciding a motion to

dismiss under Rule 12(b)(6), the court is required to accept as true all of the factual allegations in the complaint, *Erickson v. Pardus*, — U.S. —, 127 S. Ct. 2197, 2200 (2007), and all reasonable inferences permitted by the factual allegations, *Watson v. Abington Twp.*, 478 F.3d 144, 150 (3d Cir. 2007), viewing them in the light most favorable to the plaintiff, *Kanter v. Barella*, 489 F.3d 170, 177 (3d Cir. 2007). *Accord Phillips*, 515 F.3d at 231. If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiff's claim is "plausible on its face," a complaint will survive a motion to dismiss. *Twombly*, 127 S. Ct. at 1965, 1974; *Phillips*, 515 F.3d at 231-32; *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007); *Stevenson v. Caroll*, 495 F.3d 62, 66 (3d Cir. 2007). This requirement "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" necessary elements of the plaintiff's cause of action. *Twombly*, 127 S. Ct. at 1965, *quoted in Phillips*, 515 F.3d at 234.

Finally, in the Third Circuit, a court must grant leave to amend before dismissing a civil rights complaint that is merely deficient. *See*, *e.g., Phillips*, 515 F.3d at 245-46; *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247,252 (3d Cir. 2007); *Weston v. Pennsylvania*, 251 F.3d 420, 428 (3d Cir. 2001); *Shane v. Fauver*, 213 F.3d 113, 116-17 (3d Cir. 2000). "Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility." *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004).

**III.**      **Discussion**

The court will evaluate the merits of the four motions at bar as follows. First, the court will address the validity of Plaintiff's IDEA claim against Northwestern and the River Center and those Defendants' motion to dismiss the School District Defendants' cross-claim regarding contractual indemnification for IDEA liability.  Next, the court will turn to Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 and whether they survive the motions to dismiss his amended complaint.  Last, the court will discuss the various tort claims at issue, both Plaintiff's state tort law claims and the School District Defendants' cross-claim against the Northwestern Defendants for common law indemnification and contribution.

**A.      The IDEA**

**1.      Direct Liability for Northwestern and the River Center**

Count II of the amended complaint charges Northwestern and the River Center with a violation of the IDEA.  These Defendants, however, are not subject to direct liability under provisions of the IDEA because they are private entities.  The IDEA provides that:

> [t]he State educational agency is responsible for ensuring that --
> (i) the requirements of [the IDEA] are met;
> (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency --
> (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
> (II) meet the educational standards of the State educational agency.

11

20 U.S.C. § 1412(a)(11); *see* § 1415(a)[3] (A "State educational agency, State agency, or local educational agency that receives assistance under [the IDEA] shall establish and maintain procedures . . . to ensure that children with disabilities . . . are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies."); § 1407(a) ("Each State that receives funds under this chapter shall . . . ensure that any State rules, regulations, and policies relating to this chapter conform to the purposes of this chapter . . . ."); § 1411 (establishing funding).

Definitions of the various agencies charged with implementing the IDEA in the foregoing statutes are in order. A "state educational agency," or "SEA" is "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools, or, if there is no such officer or agency, an officer or agency designated by the Governor or by State law." § 1401(32); *accord* 34 C.F.R § 300.41.

An "educational service agency," or "ESA":

(A) means a regional public multiservice agency –
(i) authorized by State law to develop, manage, and provide services or programs to local educational agencies and;
(ii) recognized as an administrative agency for purposes of the provision of special education and related services provided within public elementary schools and secondary schools of the State; and
(B) includes any other public institution or agency having administrative control and direction over a public elementary school or secondary school.

20 U.S.C. § 1401(5); *accord* 34 C.F.R § 300.12; 22 Pa. Code § 14.102(a)(2)(iii).

---

[3] Pennsylvania has charged the State Board of Education to "adopt and prescribe standards and regulations for the proper education and training of all exceptional children," 24 Pa. Stat. Ann. § 13-1372(1), which exceptional children include children with disabilities, § 13-1371(1). The Board of Education adopted the federal regulations implementing the IDEA and incorporated by reference many federal regulations into the Pennsylvania Code. 22 Pa. Code § 14.102.

A "local educational agency" or "LEA" is

a public board of education or other public authority legally constituted within a State for either administrative control or direction of, or to perform a service function for, public elementary school or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its public elementary or secondary schools.

20 U.S.C. § 1401(19)(A).  An ESA is a LEA, as is "any other public institution or agency having administrative control and direction of a public elementary school or secondary school."  § 1401(19)(B).  The regulation implementing the IDEA defines LEA in accordance with the statute.  34 C.F.R § 300.28; *accord* 22 Pa. Code § 14.102(a)(2)(iii).  The Pennsylvania Code expands the definition of LEA to include "an intermediate unit, school district, State operated program or facility or other public organization providing educational services to children with disabilities or providing early intervention services."  22 Pa. Code § 14.103.

Although the IDEA does not include a definition of "public agency," the implementing regulations do.  A public agency "includes the SEA, LEAs, ESAs, non-profit public charter schools that are not otherwise included as LEAs or ESAs and are not a school of an LEA or ESA, and any other political subdivisions of the State that are responsible for providing education to children with disabilities."  34 C.F.R. § 300.33; *see* 22 Pa. Code § 14.102(a)(2)(iii).

The foregoing law and regulations place the duty for complying with the IDEA upon public agencies.  There is no provision that imposes upon a private entity the obligation to ensure compliance with the IDEA.  *C.f. P.N. v. Greco*, 282 F. Supp. 2d 221, 237 (D.N.J. 2003) (holding a private school liable for violating the IDEA under New Jersey law specifically imposing upon private schools the

obligation to comply with its terms).  The IDEA contemplates, however, that a public agency may place a student in a private school.  *See* 20 U.S.C. § 1412(a)(10)(B).  Such placement must be "the means of carrying out the requirements of [the IDEA] or any other applicable law requiring the provision of special education and related services to all children with disabilities." § 1412(a)(10)(B)(i).  In the event of private placement, "the State educational agency shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies."[4] § 1412(a)(10)(B)(ii).  With respect to "[p]rivate schools and facilities," the regulations reiterate that "[e]ach public agency in the State is responsible for ensuring that the rights and protections [of the IDEA] are given to children with disabilities . . . [r]eferred to or placed in private schools and facilities by that public agency."  34 C.F.R. § 300.2(c); § 300.146.  Thus, even when a private entity is the means of effectuating the mandate of the IDEA, public agencies retain responsibility for ensuring that IDEA standards are upheld.  *See St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 171 (2d Cir. 2001) (holding that private entities are not liable under the IDEA); *Ullmo v. Gilmour Acad.*, 273 F.3d 671, 679 (6th Cir. 2001) (same).

Plaintiff does not dispute that Northwestern and the River Center are each a private entity and not a SEA, ESA, LEA, or public agency.  (Doc. 90 at 18.) Primary liability under the IDEA, therefore, does not rest with either of these Defendants.  Accordingly, the motion to dismiss by Northwestern and the River

---

[4] Even when a qualified child with a disability is placed in private school by his parents, the State remains responsible for enforcing compliance with the IDEA.  20 U.S.C. § 1412(a)(10)(A); 30 C.F.R. § 300.2(c)(2).

Center will be granted on this ground.  Their remaining arguments regarding this claim will not be discussed.

## 2.   Contractual Indemnification

The contract signed by the School District, Northwestern, and the River Center, however, does operate to create contractual liability for Northwestern and, or in the alternative, the River Center in the event that actions attributed to either entity create IDEA liability for the School District.  There are certain tasks that a SEA must perform to ensure that a child with a disability is being properly educated by a private entity.  *See* 34 C.F.R. § 300.147 (SEA shall provide applicable IDEA standards to a private entity with which a child with a disability has been placed and gather information about the private entity's performance by means of parent questionnaires, written reports, and site visits).  These mandatory provisions do not prohibit a public agency from using other mechanisms to encourage compliance. Here, the School District opted to use contract law in an attempt to ensure that Northwestern and the River Center complied with the IDEA and Section 504 of the Rehabilitation Act.

Among other provisions, the Agreement among the School District, Northwestern, and the River Center states:

> It is understood that NHS of PA/Juniata River Center is an independent contractor in respect to its performance under this Agreement, and shall assume all risks and responsibilities for losses of every description in connection with the service, which can be attributed either directly or indirectly to NHS of PA/Juniata River Center.  NHS of PA/Juniata River Center agrees to indemnify, defend, and hold harmless the School District, its agents and employees for, or on account of any damage or loss, including the School District's costs of litigation and attorney's fees resulting from the actions of the NHS of PA/Juniata River Center in fulfilling the terms of this Agreement.

15

(Answer, Cross-claim First ¶ 3.)  The plain language of this clause requires Northwestern and the River Center to indemnify the School District for losses the District incurs for defending claims or paying damages based upon *actions taken by or attributable to Northwestern or the River Center*.  Conversely, if the School District, Muir, or Hazel are found liable for their own actions, neither Northwestern nor the River Center will be liable under the contract.  The indemnification provision does not and cannot substitute Northwestern or the River Center as a defendant in the IDEA or Section 504 claims of the amended complaint.  It merely requires that, if the School District is held liable for violating the IDEA or Section 504 (among other possible causes of action), and the violation stems from actions taken by Northwestern or the River Center, the School District will have a contract claim against either or both entities.[5]

The parties did not identify, nor did the court's own research reveal binding case law on point, but persuasive authority convinces this court that, in light of the arguments presented on the motion to dismiss this cross-claim, the clause is enforceable.  Dictum from the Second Circuit suggests its inclination to enforce such an indemnification provision between a school district and a private entity.  After holding that only a public agency may be held directly liable under the IDEA, the Second Circuit observed that such agencies may require compliance with the terms of the statute by contract.  *St. Johnsbury Acad.*, 240 F.3d at 172-73.  Specifically, it anticipated that contractual "arrangements between a public agency and a private school [may be] enforceable against the private school."  *Id.*

---

[5]  The court's discussion is not intended to limit the applicability of the indemnification clause only to violations of the IDEA and the Rehabilitation Act.  This clause may be enforceable as to other claims as well, but the court declines to reach the issue on this motion to dismiss the cross-claim.

Moreover, the Office of Special Education Programs of the U.S. Department of Education ("OSEP") anticipates that public agencies would use their contractual relationships with private schools as a means to enforce the IDEA. Letter to Reedy (Aug. 24, 1990) *in* 16 E.H.L.R. 1364, 1368 n.3.  Vermont inquired of OSEP how the state could ensure "that [Vermont's] standards are consistent with federal requirements while at the same time preserving the independence of Vermont's private schools that serve children with handicapping conditions." *Id.* at 1364.  OSEP's response specifically mentioned the vehicle of contract law to enforce IDEA standards in private schools. *Id.* at 1368 n.3.

Still further, contractual enforcement advances the policy goal of the IDEA: to provide an appropriate education to qualified children with a disability. Indemnification provisions provide an incentive for a private entity, one not directly liable under the terms of the IDEA, to take every measure necessary to satisfy its standards.  The instant indemnification provision does not, as Defendants argue, suggest that the School District is abdicating its responsibility to comply with the IDEA.  Instead, the provision assists the School District to encourage and enforce compliance.  The court finds the same argument to be availing with respect to the School District's responsibilities under Section 504 of the Rehabilitation Act, and any other cause of action to which this clause may lawfully be applied.  More facts are required to determine *actual* liability under this contract claim.  The motion filed by Northwestern and the River Center to dismiss this cross-claim brought by the School District Defendants will be denied on this ground.

### B.    Plaintiff's Claims Brought Pursuant to 42 U.S.C. § 1983

### 1.    Whether the Northwestern Defendants May Be Sued

Plaintiff sues Northwestern and the River Center, via 42 U.S.C. § 1983, for violating his substantive due process rights under the Fourteenth Amendment. (Am. Compl. ¶¶ 93-104; 118-132.)  He also sues Hogeland, Wert, and Calhoun for violating his substantive due process rights and conspiracy to violate his civil rights under §1983.  (Am. Compl. ¶¶ 80-92; 105-111.)  The threshold inquiry as to all Northwestern Defendants is whether they, as private entities and individuals, may be deemed state actors who took state action for purposes of the federal claims brought via § 1983.  Plaintiff has alleged facts sufficient to suggest that they may and they did.

The Fourteenth Amendment to the United States Constitution states, in relevant part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  The text is injunctive upon the States, thus the amendment "can be violated only by conduct that may be fairly characterized as 'state action.'" *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 924 (1982).  Title 42 U.S.C. § 1983 is the vehicle for bringing suit against a state actor; it is properly invoked when a plaintiff alleges that a defendant, acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprived the plaintiff of "any rights, privileges, or immunities secured by the Constitution and laws."  This case, like *Lugar*, "concerns the relationship between the § 1983 requirement of action under color of state law and the Fourteenth Amendment requirement of state action."  457 U.S. at 924.  While some Supreme Court cases suggest distinctions between the two requirements, *see id.* at 932, others

18

do not, *see NCAA v. Tarkanian*, 488 U.S. 179, 182 n.4 (1988).  The cases do appear to agree that "[i]f a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes action 'under color of state law' for § 1983 purposes."  *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 n.2 (2001); *Abbott v. Latshaw*, 164 F.3d 141, 146 (3d Cir. 1998).

The Northwestern Defendants are private persons or entities and not state employees or agencies.[6]  "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [§ 1983].  To act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."  *United States v. Price*, 383 U.S. 787, 794 (1966), *quoted in Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (applying same standard to determine state action for purposes of Fourteenth Amendment); *accord Dennis v. Sparks*, 449 U.S. 24, 29 (1980); *Lugar*, 457 U.S. at 931-32; *Harvey v. Plains Twp. Police Dept.*, 421 F.3d 185, 195 (3d Cir. 2005); *Abbott*, 164 F.3d at 146-48.  "[S]ome sort of common purpose must be shown" to exist between the State actors and the private individuals.  *Harvey*, 421 F.3d at 195; *see Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991) ("A requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal.").  Pleading a conspiracy among state and private actors is a common, but not a necessary prerequisite to pleading joint action.  *Smith v. Wambaugh*, 29 F. Supp.

---

[6] Plaintiff alleges that Hogeland and Wert were "employees and/or agents" of the School District.  (Am. Compl. ¶¶ 9-10.)  The court will assume for purposes of this analysis that they were solely employed by Northwestern and, or in the alternative, the River Center.

2d 222, 227 (M.D. Pa. 1998).  Whether a private person or entity was a willful participant with agents of the State in depriving a plaintiff of his constitutional rights is an inquiry driven by the facts of each particular case.  *See Brentwood Acad.*, 531 U.S. at 298.

Plaintiff alleges generally that the Individual Defendants acted jointly to deprive him of his constitutional rights.  (Am. Compl. ¶¶ 13, 90).  He alleges that all Defendants and his father agreed to his placement and his IEP, in light of his known physical and mental abilities and disabilities.  More specifically, he alleges that Wert informed his father that "Defendants had been placing [Plaintiff] in a type of restrictive 'coverall,' . . . to prevent him from taking his clothes off."  (*Id.* ¶ 41.) Wert "proclaimed, in words or substance, that Defendants felt that in this case it would be 'far better to beg for forgiveness than to ask for [Mr. Koehler's] permission.'"  (*Id.*)  Hogeland "admitted that Defendants Hazel [a School District employee] and Wert had instructed her . . . to restrain, isolate and lock [Plaintiff] in the plywood room in the insulated camouflage jumpsuit whenever he became aggressive."  (*Id.* ¶ 49.)  The allegations as to who or what entity placed Plaintiff in the restrictive coverall and kept him in the converted room are made against "Defendants" generally.  These allegations are sufficient to sustain the complaint that the School District Defendants and the Northwestern Defendants acted in concert in deciding to restrict Plaintiff's freedom and, or in the alternative, in actually restricting Plaintiff's freedom.[7]

---

[7]  The court acknowledges that Plaintiff makes claims in the complaint that various Defendants acted "unilaterally" to deprive him of his constitutional rights.  These assertions appear to be inconsistent with the claim that the Northwestern Defendants participated in joint activity with the

(continued...)

This is not a case in which a plaintiff fails to allege that state actors took part in the conduct by a private individual or entity that deprived him of his constitutional rights. This is not a case in which a plaintiff seeks to rely on contractual relationships or state funding to a private entity to shoehorn the applicability of the state action doctrine on to a purely private activity. Nor is it a case in which a plaintiff alleges that extensive regulation by the state of a private entity automatically transforms private activity into that of the state. Such allegations are not sufficient to sustain a claim of joint activity. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 839-43 (1982); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 164-70 (3d Cir. 2001). Here, Plaintiff provides more than conclusory statements that the state and private Defendants took joint action. *See Abbott*, 164 F.3d at 148. He alleges that individuals representing the state and individuals representing the private entities participated in decisions and actions that led to his restraint and confinement. They acted as a team. Plaintiff has pled joint activity between the public and private defendants sufficient, at the instant procedural posture, to deem the Northwestern Defendants state actors.[8] Discovery may produce facts which may require this issue to be revisited. Now, however, the Northwestern Defendants' motions to dismiss will be denied on this ground.

---

[7](...continued)
School District Defendants to deprive him of his constitutional rights. (*See, e.g.*, Am. Compl. ¶¶ 86-87, 98-99.) Although Plaintiff's complaint may be internally contradictory, all Defendants are sufficiently on notice of the allegations against which they must defend. Discovery will produce the facts necessary to hone the issues.

[8] The court declines to determine whether Northwestern and the River Center, as private entity defendants, are "persons" under § 1983. They raise the issue obliquely in their reply brief on their motion to dismiss the amended complaint. In the absence of more substantive argument and the benefit of the adversarial process, the court will not decide the issue at this time.

## 2.   Whether the Individual Northwestern Defendants are Entitled to Qualified Immunity

_____Individual Northwestern Defendants argue that if they are deemed state actors, they should be given the benefit of the doctrine of qualified immunity.  They do not address the threshold question of whether private persons, even those deemed to be state actors, are entitled to assert the defense.  *See Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (private prison guards sued under § 1983 may not assert qualified immunity); *Wyatt v. Cole*, 504 U.S. 158 168-69 (1992) (qualified immunity not available to a private defendant charged, under § 1983, with invoking a state replevin, garnishment, or attachment statute); *Toussie v. Powell*, 323 F.3d 178, 183 (2d Cir. 2003) (private defendant alleged to have conspired with government officials not entitled to qualified immunity).  *But see Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (non-profit foster care service agency and employees entitled to qualified immunity).  The court need not decide the question as it relates to the Individual Northwestern Defendants because it would be premature to decide the applicability of qualified immunity on this motion to dismiss.  Moreover, the crux of Individual Northwestern Defendants' argument is that Plaintiff fails to state a constitutional claim for deprivation of substantive due process.  The court disagrees.

The Fourteenth Amendment prohibits the State from depriving an individual of life, liberty, or property without due process of law.  U.S. Const. amend. XIV § 1.  In *Ingraham v. Wright*, the Supreme Court held that physical punishment of a student, by state actors, implicates the liberty interest protected by the Fourteenth Amendment.  430 U.S. 651, 672 (1977); *accord Gottlieb v. Laurel*

*Highlands Sch. Dist.*, 272 F.3d 168, 172 (3d Cir. 2001); *Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir. 1988). The substantive component of the Due Process Clause "protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (quotation omitted); *accord Gottlieb*, 272 F.3d at 172; *Metzger*, 841 F.2d at 520-21. Actions by agents of the state, or those deemed state actors, violate substantive due process when they shock the judicial conscience. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998); *Gottlieb*, 272 F.3d at 172.

"Conscience shocking" behavior does "more than offend some fastidious squeamishness or private sentimentalism." *Rochin v. California*, 342 U.S. 165, 172 (1952), *overruled on other grounds by Mapp v. Ohio*, 367 U.S. 643 (1961). It is offensive to human dignity and brutal. *Id.* at 174. It is conduct intended to injure another person "in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. "Conscience shocking" actions go beyond actions compensable in ordinary intentional and negligent tort law. *Collins*, 503 U.S. at 128; *Lewis*, 523 U.S. at 848 ("[T]he Constitution does not guarantee due care on the part of state officials."). Whether state action is conscience-shocking must be determined by the totality of the circumstances giving rise to the constitutional claim. *Lewis*, 523 U.S. at 850.

When a student alleges that a teacher or administrator disciplined him in a way that violated his substantive due process rights, the court's inquiry begins with four questions:

> a) Was there a pedagogical justification for the use of force?; b) Was the force utilized excessive to meet the legitimate objective in this

situation?; c) Was the force applied in a good faith effort to maintain or restore discipline or maliciously . . . [⁹] for the very purpose of causing harm?; and d) Was there a serious injury?

*Gottlieb*, 272 F.3d at 173.  Plaintiff's complaint alleges facts suggesting that there was no pedagogical justification for the use of force against him and the circumstances under which he was restrained; the force was excessive and brutal, unjustified by a government interest; it was not applied in good faith, but for a punitive purpose related to his disability and not his behavior; and that he experienced serious physical, mental, and emotional injuries as a result.  Individual Northwestern Defendants argue that the practice of restraining students who act out, as they did Plaintiff, is commonplace and well within constitutional bounds.  That may prove to be true, but evaluation of Plaintiff's constitutional claims must be postponed until facts are adduced.  *See Metzger*, 841 F.2d at 521 (reversing district court's grant of summary judgment because a fact question remained on whether a defendant intended to cause harm); *Vicky M. v. Ne. Educ. Intermed. Unit 19*, 486 F. Supp. 2d 437, 456 (M.D. Pa. 2006) (denying motion to dismiss because complaint adequately stated behavior by state actors that was sufficiently shocking to the conscience).  Individual Northwestern Defendants' motion to dismiss will be denied on this ground.[10]

---

[9]  The original quote from *Gottlieb* includes "and sadistically" where the ellipses are found in this opinion.  In a footnote later in the case, the Third Circuit clarified that "[p]recedent does not require that the alleged offender take pleasure or satisfaction from the injury, as ["sadistically"] entails, but rather only that the offender intended harm.  The requirement that the act be sadistic, therefore, adds nothing to the requirement that it be malicious."  272 F.3d at 175 n.1.  Accordingly, the parties may proceed on the rule stated herein.  There is no need to demonstrate sadism on the part of any Defendant.

[10]  For the same reason, the court will deny Individual Defendants' motion to dismiss Plaintiff's claim for conspiracy to violate his civil rights.  They base this aspect of their motion on the

(continued...)

### 3.   Plaintiff's Claims for Deliberate Indifference and Failure to Train and/or Supervise

Northwestern and the River Center argue that Plaintiff's allegations supporting his claims for deliberate indifference and failure to train and, or in the alternative, to supervise must fail because they are "nothing more than Section 1983 claims brought to redress violations of the IDEA."  (Doc. 68 at 41.)  Because § 1983 does not create substantive rights, they continue, these counts must be dismissed with prejudice.  (*Id.* at 41-42.)  Indeed, *A.W. v. Jersey City Public Schools* forecloses this avenue of redress.  486 F.3d 791, 803 (3d Cir. 2007) ("Congress did not intend § 1983 to be available to remedy violations of the IDEA . . . .").  Reading Plaintiff's complaint as a whole, however, the court cannot conclude that a violation of the IDEA is Plaintiff's sole support for his claims of deliberate indifference and failure to train or supervise.

As related *supra*, Plaintiff adequately states a claim that Individual Defendants – employees of Northwestern and, or in the alternative, of the River Center – violated his right to substantive due process.  He alleges that Northwestern and the River Center, or each independently, were deliberately indifferent to the activities of Individual Defendants as they deprived him of substantive due process.  (Am. Compl. ¶ 123.)  He alleges that Northwestern and, or in the alternative, the River Center failed to properly instruct and, or in the alternative, to supervise Individual Defendants, which allowed the occurrence of the physical punishment which constituted a violation of Plaintiff's substantive due process rights.  (*See id.*

---

[10](...continued)
argument that Plaintiff fails to state a claim for a deprivation of his civil rights.  In light of the immediately foregoing discussion, this argument must fail.

¶¶ 129, 131-32.)  Thus, to the extent that Plaintiff's claims under § 1983 for deliberate indifference and failure to train and, or in the alternative, to supervise are based on the alleged violation of substantive due process, they survive.  *Accord K.R. v. Sch. Dist. of Phila.*, Civil Action No. 06-2388, 2007 WL 2726236, at *3 (E.D. Pa. Sept. 14, 2007) (noting that *A.W.* mandates dismissal of § 1983 claims based on violation of the IDEA, not § 1983 claims based on violation of constitutional rights). Northwestern and the River Center do not present an alternative argument as to why these claims should be dismissed.  Their motion will be denied on these grounds.

### C.   Tort Law

#### 1.   Plaintiff's Tort Claims

Plaintiff brings claims against the Northwestern Defendants for negligence and intentional infliction of emotional distress.  Individual Northwestern Defendants argue that these claims are preempted by the IDEA's comprehensive remedial scheme.  They do not engage in a substantive analysis of the preemption question.  Instead, they rely on *Smith v. Robinson*, 468 U.S. 992, 1012-13 (1984), for the proposition that "[t]he IDEA . . . provides the exclusive means by which parents and children can remedy violations of the rights guaranteed therein."  (Doc. 69 at 21.)  They fail to disclose that the Supreme Court's holding in this case was abrogated by Congress in 20 U.S.C. § 1415(*l*), which provides that the IDEA is *not* the exclusive means by which parents and children can vindicate the rights guaranteed therein.  Individual Northwestern Defendants then cite a single case, *Farrell v. Carol Stream School District No. 25*, No. 96 C 1489, 1996 WL 364743 (N.D. Ill. June 27, 1996), to support the proposition that any state law negligence action is preempted by the IDEA.  (Doc. 69 at 22.)

As an initial matter, *Farrell* relied on the abrogated holding in *Smith*. Moreover, the state law negligence claim in *Farrell* charged that a school district breached its duty to identify a student with a disability and provide him with a free appropriate public education.  The IDEA was the source of the duty alleged, thus the claim clearly fell within the statute's remedial scheme.  Here, however, Plaintiff alleges more than a breach of duty to provide him a free appropriate public education.  Plaintiff asserts a breach of the duty of care that every educator owes to every student, regardless of the student's special education status.  He alleges that the Northwestern Defendants 1) had a duty to care for Plaintiff while he was in their custody; 2) breached that duty by subjecting Plaintiff to the "pattern of mistreatment, isolation, confinement, restraint and abuses" detailed elsewhere in the amended complaint; and 3) their breach of the duty of care was the direct and proximate cause of Plaintiff's injuries in this case.  (*See* Am. Compl. ¶¶ 142-145.)  This claim does not fall within the remedial scheme encompassed by the IDEA and is properly brought under state law.  Although the events giving rise to Plaintiff's allegations arose in an educational setting, the IDEA is not the beginning and end of his remedies.

Northwestern and the River Center submit that Plaintiff's negligence claim "should be dismissed as it is incongruous with his substantive due process claim."  (Doc. 68 at 44.)  There is no prohibition on pleading in the alternative; if Plaintiff's substantive due process ultimately fails because Defendants' actions were not conscience-shocking, their actions may nevertheless support a negligence claim.

The court will exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a) because the claims are intertwined with the federal

questions presented.  The motions filed by the Northwestern Defendants to dismiss these claims will be denied on the grounds stated in this subsection.

### 2.   <u>Common Law Indemnification and Contribution</u>

The School District Defendants' second cross-claim against the Northwestern Defendants states that, to the extent that Plaintiff states a claim for damages in the amended complaint, the Northwestern Defendants were the sole cause of his injuries.  Next, it demands contribution or indemnity from the Northwestern Defendants if the School District Defendants are held liable for all or part of Plaintiff's alleged damages. (Answer, Cross-claim Second ¶¶ 6-8.)  The Northwestern Defendants seek dismissal of this cross-claim.

The claims against the School District Defendants are as follows. Against the School District, the claims are: 1) violation of the IDEA and Section 504, 2) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment; 3) deliberate indifference to the risk of injury to Plaintiff; 4) failure to train and, or in the alternative, to supervise Plaintiff's special education program such that he sustained constitutional injury; and 5) breach of its special custodial relationship with Plaintiff.  Against Muir and Hazel, the claims are: 1) violation of Plaintiff's substantive due process rights under the Fourteenth Amendment and 2) conspiracy to violate his civil rights.

Common law indemnification or contribution for these claims may not be decided without factual flesh on the bones of the allegations made in the amended complaint.  It is premature to address the question of whether and how any Northwestern Defendant may be liable in tort contribution or indemnity to the

School District Defendants when actual liability is yet undetermined.  The Northwestern Defendants' motions to dismiss this cross-claim will be dismissed without prejudice to their ability to raise the issue at a more appropriate stage of this proceeding.

**IV.**      **<u>Conclusion</u>**

For the foregoing reasons, the motion to dismiss the amended complaint by Northwestern and the River Center will be granted in part and denied in part.  The motion to dismiss the amended complaint by the Individual Northwestern Defendants will be denied.  The Northwestern Defendants' motions to dismiss the cross-claims brought by the School District Defendants will be denied. An appropriate order will issue.

<div style="margin-left:50%">

s/Sylvia H. Rambo
SYLVIA H. RAMBO
United States District Judge

</div>

Dated:  April 17, 2008.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JAEDON KOEHLER, a minor**<br>**by and through his parent and**<br>**legal guardian, Scott C.**<br>**Koehler,** | : | **No. 1:07-CV-0117** |
| | : | |
| | : | **JUDGE SYLVIA H. RAMBO** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **JUNIATA COUNTY SCHOOL**<br>**DISTRICT, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## O R D E R

For the reasons stated in the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT**:

1) The motion to dismiss filed by Defendants Northwestern and River Center (Doc. 56) is **GRANTED** in part and **DENIED** in part.

    (a) The motion is **GRANTED** as to Count II of Plaintiff's amended complaint.

    (b) The motion is **DENIED** in all other respects.

2) The motion to dismiss filed by Defendants Hogeland, Wert, and Calhoun (Doc. 57) is **DENIED**.

3) The motion filed by Defendants Northwestern and River Center to dismiss the cross-claims brought by the School District, Muir, and Hazel (Doc. 77) is **DENIED**.

       4) The motion filed by Defendants Hogeland, Wert, and Calhoun to dismiss the cross-claims brought by the School District, Muir, and Hazel (Doc. 72) is **DENIED**.

                                        s/Sylvia H. Rambo
                                    SYLVIA H. RAMBO
                                    United States District Judge

Dated:  April 17, 2008.